**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZENG JEAN-JAQUES, | Civil Case No.: 1:24-cv-5219 |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION LLC, | |
| Defendants. | |

Plaintiff Zeng Jean-Jaques ("Plaintiff"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); and Trans Union LLC ("Trans Union") (collectively, "Defendants") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is

disseminated and/or obtained about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system. *See* 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible

mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed. *See Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.      The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.      Plaintiff's claims arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants reported to Plaintiff's credit file a disputed amount – an issue already under a pending action – concerning Plaintiff's Discover account.

12.     Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14.     Plaintiff is a natural person residing in Brooklyn, New York and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District. Equifax can be served through its registered agent Corporation Service Company located at 2 Sun Court, Suite 400 Peachtree Corners, Georgia 30092.

16.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Defendant Experian is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State

of New York, including within this District. Experian can be served through its registered agent C T Corporation System located at 330 N Brand Blvd, Glendale, CA 91203.

18.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

19.     Defendant Trans Union is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of New York, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

20.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

23.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

24.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

25.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

26.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

27.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Overview of the Credit Reporting Industry

28. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

29. Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

30. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

31. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

32. Defendants' consumer reports generally contain the following information:

   (a) <u>Header/Identifying Information</u>: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

   (b) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

   (c) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and,

   (d) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (*i.e.*, consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (*i.e.*, user-initiated inquiries like prescreening).

33.     Defendants obtain consumer information from various sources.  Some consumer information is sent directly to the CRA by furnishers.

34.     The majority of institutions that offer financial services (*e.g.*, banks, creditors, and lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions.

35.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in Defendants' consumer reports.

36.     The information Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

37.     FICO Scores are calculated using information contained in Defendants' consumer reports.

38.     Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

39.     Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

40.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

41.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it

will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

42.     Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

43.     Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

44.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Defendants for their inaccurate credit reporting.

45.     Thus, Defendants are on continued notice of their respective inadequate reporting procedures.   Specifically, Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

46.     Defendants have received and documented many disputes from consumers complaining that Defendants reported inaccurate information about them.

**How CRAs Process Consumer Credit Report Disputes**

47.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

48.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for

automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

49.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

50.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

51.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

52.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

53.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

54.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

55.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

56.     The data furnishers, like Discover, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

57.     Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff Files a Claim Against Discover for Undelivered Amazon Package**

58.     On June 19, 2023, Plaintiff used his Discover credit card to purchase cellular phones from Amazon, amounting to $4,354.90.  The charge for the purchase posted to Plaintiff's Discover card the next day.

59.     On June 21, 2023, Amazon notified Plaintiff that the package was delivered.

60.     Plaintiff was surprised to receive that notification because the package had not been delivered.

61.     Plaintiff immediately contacted Amazon customer service via chat to report that the package was not delivered.  The Amazon representative confirmed that "the delivery status [was] updated too soon" and that "it should arrive soon. Give us until the end of the day Thursday, Jun [sic] 22," as shown below:



Image:  Screenshot of June 21, 2023 Chat with Amazon Representative

62.     The items were not delivered on June 22, 2023 as promised.

63.     Notably, given the dollar amount of the purchase, Amazon had applied a security feature to this order called "One Time Passcode" or "OTP."  That means that the Amazon delivery driver was not permitted to deliver the package unless he was first provided with a security code (*i.e.*, a One Time Passcode) that was emailed to Plaintiff's personal email address.  No one but

Plaintiff had access to the email address and Plaintiff did not provide the OTP code to the Amazon delivery driver. Thus, the package could not have been delivered.

64.     Moreover, video footage from Plaintiff's home security system confirmed that the package was not delivered.

65.     Plaintiff immediately notified Amazon that he did not receive the package.  He also explained that the driver did not comply with the OTP protocol and that the security footage showed that the package was not delivered.

66.     In response, the Amazon representative advised that Amazon would conduct an internal investigation that would take 3-4 business days.

67.      On June 27, 2023, Plaintiff disputed the charge with Discover and the transaction was placed in dispute for nonreceipt of goods and services.

68.     By email dated June 28, 2024, Amazon asked Plaintiff for more information about the dispute.

69.     Later that day, Plaintiff responded to Amazon's request by providing a detailed narrative of the facts giving rise to the dispute.  Plaintiff's email included 32 pages of attachments, including annotated screenshots of chats with the Amazon driver.  The screenshots include the chats wherein Amazon admitted that package had not been delivered, purported to open a dispute ticket, and eventually admitted that no investigation was ever opened. The screenshots also confirmed that Plaintiff notified Amazon that there was no OTP and that he did not give anyone else access to the OTP email address.  Finally, the email explained to them that surveillance cameras on Plaintiff's property confirmed that the Amazon driver never delivered the package.

70.     In March 2024, Amazon notified Plaintiff that a refund had been issued for the transaction.

71.     However, the refund was not reflected on Plaintiff's account statement.

72.     To make matters worse, Defendants reported an account balance on Plaintiff's Discover account that included the charge for the Amazon purchase that was not delivered.

73.     The balance reported on the Discover account was inaccurate because it included a charge that had been refunded and for which Plaintiff was not liable.

74.     As a result, the reported balance made it appear that plaintiff was utilizing over 90% of his credit limit and adversely affected Plaintiff's credit.

**Plaintiff's Disputed the Inaccurate Credit Reporting (April 2024)**

75.     On or about April 5, 2024, extremely shocked, surprised, and frustrated at Defendants' inaccurate reporting, Plaintiff submitted written disputes to each Defendant disputed the account balance on the Discover tradeline.

76.     In each dispute letter, Plaintiff explained that the account balance was inaccurate because Amazon had already issued a refund for the missing phones.  Each dispute letter included a screenshot of the conversation in which the Amazon representative admitted that the phone was not delivered on June 21, 2023, Discover statements reflecting the charge for the missing order, and a copy of the email from Amazon confirming that the dispute had been resolved in Plaintiff's favor.

77.     Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

78.     Within the body of each dispute letter, Plaintiff included his full name, mailing address, social security number, and date of birth.

79.     To help Defendants locate his credit file and to prove his identity, Plaintiff enclosed his United States Passport Card and his Geico insurance card containing his current mailing address.

### Defendant Equifax's Unreasonable Dispute Reinvestigation

80.     The letter was delivered to Equifax on April 9, 2024.

81.     Upon information and belief, Equifax sent Discover an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 2024 dispute to Equifax.

82.     By letter dated April 14, 2024, Defendant Equifax responded to Plaintiff's April 2024 dispute stating that the Discover account is being reported correctly.

83.     Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

84.     Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute.

85.     Thereafter, Defendant Equifax failed to correct or exclude the disputed Amazon Charge from Plaintiff's Discover Account balance appearing in Plaintiff's credit file.

86.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 2024 or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant Experian's Unreasonable Dispute Reinvestigation

87.     The letter was delivered to Experian on April 9, 2024.

88.     Upon information and belief, upon receiving Plaintiff's April 5 dispute letter, Defendant Experian sent Discover an automated credit dispute verification ("ACDV").

89.     In the alternative, Defendant Experian failed to send Discover an ACDV because it falsely labeled the dispute as suspicious.

90.     By letter dated April 12, 2024, Defendant Experian acknowledged Plaintiff's dispute, but claimed it was unable to locate Plaintiff's credit file and requested more information to located Plaintiff's credit file, including Plaintiff's full name, social security number, date of birth, mailing addresses for the past two years, a government-issued identification card, or a utility bill, bank, or insurance statement.

91.     Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute, or it would not have requested the exact same information that Plaintiff had *already* provided.

92.     Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's April 5, 2024 dispute.

93.     Thereafter, Defendant Experian failed to correct or exclude the disputed Amazon Charge from Plaintiff's Discover Account balance appearing in Plaintiff's credit file.

94.     Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 2024, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

95.     Plaintiff's April 5 letter was delivered to Trans Union on April 8, 2024.

96.     Upon information and belief, upon receiving Plaintiff's April 5 dispute letter, Trans Union sent Discover an ACDV.

97.     By letter dated April 16, 2024, Defendant Trans Union responded to Plaintiff's dispute and failed to correct the inaccurate balance on the Discover account.

98.     Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

99.     Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute.

100.    Thereafter, Defendant Trans Union failed to correct or exclude the disputed Amazon Charge from Plaintiff's Discover Account appearing in Plaintiff's credit file.

101.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered August or September 2022, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Second and Third Dispute to Defendant Experian (May 2 and 9, 2024)**

102.    On May 2, 2024, unsatisfied by Defendant Experian's lack of action and obvious refusal to reinvestigate Plaintiff's disputes, Plaintiff submitted a second dispute to Defendant Experian demanding the correction of the balance on his Discover account.

103.    On May 9, 2024, desperate to have his dispute properly addressed and out of an abundance of caution, Plaintiff mailed a third dispute to Defendant Experian.

104.    In each dispute, Plaintiff explained that the balance reported on his Discover tradeline was inaccurate.

105.    Plaintiff requested that Defendant Experian reinvestigate the disputed information, correct the reporting, and for Defendant Experian to send him a corrected copy of his credit report.

**Defendant Experian's Unreasonable Reinvestigation May-June 2024**

106.    The second dispute letter was delivered to Experian on May 9, 2024.

107. Upon information and belief, upon receiving the second dispute, Experian sent an ACDV to Discover.

108. The third dispute letter was delivered to Experian on May 16, 2024.

109. Upon information and belief, upon receiving the third dispute, Experian sent an ACDV to Discover.

110. By email dated May 22, 2024, Defendant Experian acknowledged Plaintiff's dispute and stated that the dispute was being processed.

111. By email dated June 2, 2024, Defendant Experian notified Plaintiff that the investigation was still underway and had not been completed.

112. By email dated June 9, 2024, Defendant Experian again notified Plaintiff that the investigation was still underway and had not been completed.

113. On June 11, 2024, Experian notified Plaintiff via email that his investigation results were complete.

114. Plaintiff was unable to access the results using the link in the email so he called Experian to learn the outcome of the investigation and to request a hard copy of the investigation results.

115. In response to Plaintiff's inquiry, an Experian representative confirmed that "everything stayed the same" and that the balance for the missing Amazon purchase had not been removed or corrected.

116. Plaintiff later received a letter from Experian dated June 11, 2024, which stated that Experian's investigation was complete and that balance on the Discover account had been verified as accurate.

117.    Defendant Experian failed to adequately review all of the information provided by Plaintiff in support of his dispute.

118.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's second and third disputes.

119.    Defendant Experian failed to correct or exclude the disputed balance on Plaintiff's Discover Account appearing in Plaintiff's credit file.

120.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's second and third disputes, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

121.    Plaintiff reasonably believes that Defendants continued to publish an inaccurate account balance on his Discover tradeline.

122.    Defendants' failure to investigate and correct the inaccurate account balance resulted in a high credit utilization ratio and impacted Plaintiff's ability to obtain credit at favorable rates.

123.    On July 1, 2024, Plaintiff applied for a credit limit increase on his Goldman Sachs Apple Card but was denied based on a TransUnion credit report containing the inaccurate Discover account balance.

124.    On July 11, 2024, Plaintiff applied for a Chase Sapphire credit card to pay for his credit card.  Chase granted the application and awarded him credit on less favorable terms than he would have received but for the inaccurate balance on his Discover account.

125.    In early July 2024, Plaintiff also applied for a credit limit increase on his Citi Diamond Preferred Mastercard.  That application, too, was denied, based on an Equifax credit report.

126.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendants herein.

127.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

128.    As a standard practice, Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

129.    Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, Defendants' violations of the FCRA are willful.

130.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(All Defendants)**

131.    Plaintiff re-alleges and realleges the foregoing allegations as if fully set herein.

132.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

133.    Defendants prepared patently false consumer reports concerning Plaintiff.

134.    Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

135.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

136.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

137.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

138.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

139.    Defendants' conduct, action, and inaction willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

140.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681i
### Failure to Conduct a Reasonable Reinvestigation
### (All Defendants)

141.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

142.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposes a 30-day time limit for the completion of such an investigation.  *Id*.

143.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

144.    Plaintiff disputed the inaccurate information with Defendants and requested that they correct and/or exclude the inaccurate balance on his Discover account.

145.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

146.    In response to Plaintiff's disputes, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

147.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

148.    Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

149.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

150.    Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

151.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: July 26, 2024

> By: /s/ Moshe Boroosan
> Moshe Boroosan, Bar No. 5429915
> **CONSUMER ATTORNEYS**
> 1318 Avenue J, 2nd Floor,
> Brooklyn, NY 11230
> T: (718) 887-2926
> F: (718) 715-1750
> Email: mboroosan@consumerattorneys.com
>
> *Attorneys for Plaintiff*
> *Zeng Jean-Jaques*